1  Ryan A. Ellis, Esq. (SBN: 272868)
2  HOWARD & HOWARD ATTORNEYS PLLC
   2049 Century Park East, Suite 330
3  Los Angeles, CA 90067
   Telephone: (424) 303-7700
4  Facsimile: (424) 274-3202
   Email: re@h2law.com
5
6  *Attorneys for Plaintiffs ForeSee Results, Inc.*
   *and Answers Corporation*
7

8  ## UNITED STATES DISTRICT COURT
9  ## NORTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  FORESEE RESULTS, INC., a Delaware Corporation; ANSWERS CORPORATION, a Delaware Corporation, | Case No.: <br> Dept. No.: |
| 13  Plaintiffs, | COMPLAINT FOR: |
| 14  v. | (1)   COPYRIGHT INFRINGEMENT |
| 15  AURYC, INC., a Delaware Corporation, also known as AURYC, LLC; JINLIN WANG, an individual; FENG SHAO, an individual; AMOD SETLUR, an individual; DOES 1 through 20, inclusive; | (2)   VIOLATION OF THE DEFEND TRADE SECRETS ACT <br> (3)   BREACH OF CONTRACT <br> (4)   BREACH OF THE DUTY OF LOYALTY <br> (5)   BREACH OF FIDUCIARY DUTY |
| 19  Defendants. | DEMAND FOR JURY TRIAL |

21  ## BACKGROUND

22  1.   Plaintiffs ForeSee Results, Inc. and Answers Corporation ("Plaintiffs") bring this
23  case because three high-level executives left their employment with handsome severances and
24  good wishes, but then started a competing business using Plaintiffs' confidential and trade secret
25  information in violation of applicable law and their employment contracts, including using secret
26  software code and know-how for the highly-sophisticated web site functionality developed by
27  Plaintiffs.  This conduct is wrongful and amounts to copyright infringement, misappropriation of
28  trade secrets, breach of contract, breach of duty of loyalty, and breach of fiduciary duty.

1

**PARTIES**

2.      Plaintiff ForeSee Results, Inc. ("ForeSee") is a corporation incorporated in and organized under the laws of the State of Delaware, with its principal place of business located in the State of Michigan.

3.      Plaintiff Answers Corporation ("Answers" or referred to collectively with ForeSee as "Plaintiffs") is a corporation incorporated in and organized under the laws of the State of Delaware, with its principal place of business located in the State of Missouri.

4.      On information and belief, Defendant Jinlin Wang ("Wang") is an individual residing in the State of California, County of Santa Clara, at 30 Maynard Way, Los Altos, CA 94022.

5.      On information and belief, Defendant Feng Shao ("Shao") is an individual residing in the State of California, County of Santa Clara, at 3876 Dunford Way, Santa Clara, CA, 95051.

6.      On information and belief, Defendant Amod Setlur ("Setlur") is an individual residing in the State of California, County of Santa Clara, at 45 Prado Court, Portola Valley, CA, 94028.

7.      On information and belief, Defendant AURYC, Inc. ("AURYC," or referred to collectively with Wang, Shao and Setlur as "Defendants") is a corporation incorporated and organized in the State of Delaware, with its principal place of business located at 5050 El Camino Real, Suite 202, Los Altos, CA  94022, and is subject to the control and direction of Wang, Shao and/or Setlur.

**JURISDICTION AND VENUE**

8.      Count I of this Complaint arises under the Copyright Act, 17 U.S.C. §§ 101 et seq.  This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331 and 1338.

9.      Count II of this Complaint arises under the Defend Trade Secrets Act, 18 U.S.C. §1836.  This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §1836(c).

10.   The Court has supplemental subject matter jurisdiction over the state law claims set forth in Counts III-V of this Complaint pursuant to 28 U.S.C. § 1337 because these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution and derive from a common nucleus of operative facts.

11.   Personal jurisdiction over Defendants is proper in this State because AURYC is licensed to conduct business in the State of California, and upon information and belief, the individual Defendants reside in this district.

12.   Venue is proper because a substantial part of the events giving rise to the claims occurred and continue to occur in Santa Clara County, California.

13.   On information and belief, all of the Defendants are subject to the personal jurisdiction of this Court. On information and belief, Wang, Shao, Setlur and AURYC have committed the acts outlined herein and below within the State of California.

A.   **Background of the Parties Involved**

14.   ForeSee Results, Inc., has been a dominant vendor in the customer experience analytics space since its formation in 2001, and currently generates revenue close to $100 million per year.

15.   ForeSee provides an important service to its clients that operate websites for use by their customers.  ForeSee collects customer feedback through online surveys, providing a software-based solution to bridge the communication gap between ForeSee's clients and their customers.

16.   In 2008, ForeSee acquired early Session Replay technology developed primarily by Alexei White, who became a ForeSee employee as part of the Session Replay acquisition.

17.   ForeSee's Session Replay product allows ForeSee's clients to pair their survey data with web analytics that visualize a web user's experience.  This means for every customer who completes a survey, ForeSee's clients can watch a "movie"–like re-creation of what the customer did on the client's website.

18.   From a business perspective, it is a valuable insight to learn, for example, that a customer was unable to complete an online purchase, and to watch what the customer

COMPLAINT

experienced within the website while trying to make that purchase.

19.    In 2013, ForeSee was acquired by Plaintiff Answers Corporation.  Thereafter, both ForeSee and Answers used their combined expertise and technology in the customer experience analytics space not only to improve existing technologies/products, but to develop new technologies/products.

**B.    Defendant Jinlin Wang**

20.    Defendant Wang was employed by Answers before its acquisition of ForeSee.  As relevant here, on or about October 3, 2014, Defendant Wang entered into an employment agreement with Answers, accepting the position of Chief Technical Officer. A true and correct copy (redacted) of Wang's employment agreement is attached hereto as Exhibit 1.

21.    As the Chief Technical Officer of Answers, Defendant Wang worked extensively with both ForeSee and Answers on confidential, trade secret technology in the customer experience analytics space.

22.    In Wang's employment agreement, Wang "acknowledges and agrees, as consideration for entering into [the employment agreement], that [Wang] is subject to the restrictive covenants set forth in the Restrictive Covenant Agreement…" *See Exhibit 1, Section 8.*

23.    Wang accepted Plaintiffs' restrictive covenant agreement (the "RCA") contemporaneously with his employment agreement. Exhibit 1 hereto includes a true and correct copy of the Wang RCA, which is attached as Exhibit A to Exhibit 1.

24.    The RCA expressly states that Wang "shall not use, or permit to be used, for any purpose other than the furtherance of the business of [Plaintiffs] or its affiliates (which includes but is not limited to all of its business units, divisions and subsidiaries) (the "Company Group"), or disclose to any person, any Confidential Information of the Company Group." *See Exhibit 1A, Section 1.*  Accordingly, Company Group includes not just Plaintiff Answers, but also Plaintiff ForeSee and other affiliates, etc.

25.    The term "Confidential Information" is defined broadly in the RCA, and throughout this Complaint, as:

all information, data, and materials relating to the business of any member of the Company Group that is treated by the Company as confidential, including without limitation: (i) trade secrets, inventions, ideas, formulas, processes, prototypes, models, source and object codes, data, know-how, improvements, discoveries, designs, and techniques developed, created, conceived of, or reduced to practice by any employee or contractor of the Company Group; (ii) the nature and description of development and business plans for the Company Group, including plans for research and future products, budgets, marketing, customer data, and information relating to relationships between the Company Group and other entities, including licenses and other contracts; (iii) reports and data developed or acquired by the Company Group or its affiliates; and (iv) forms, policies, and other forms of written and non-written (including intangible) data, experience, and information, whether of a technical, operational, or economic nature relating to the business, services and employees of the Company Group. "Confidential Information" includes the information of third parties that the Company is required to keep confidential. *Id.*

26. Plaintiffs' Confidential Information includes, but is not limited to, Session Replay, along with its source code, object code and related code, including subsequently developed code.

27. Led by Answers Chief Technology Officer Jinlin Wang, Answers began an initiative to develop a simplified "Feedback" functionality as part of ForeSee's services, and paired that technology with ForeSee's Session Replay technology. This initiative went to the core of the Plaintiffs' proprietary technology, all of which involved and intertwined with the confidential, proprietary, and trade secret information both of Answers and ForeSee.

**C.    Defendant Feng Shao**

28. Defendant Shao was employed by Answers before its acquisition of ForeSee. As relevant here, on or about April 28, 2015, Defendant Shao entered into an employment agreement with Answers for the position of "Senior Director, Engineering." A true and correct copy (redacted) of Shao's employment agreement is attached hereto as Exhibit 2.

29. Concurrently with Shao's employment agreement, he signed a Restrictive Covenants and Invention Rights Agreement (the "Shao RCA"). *See Exhibit 3.*

30. Due to the nature of Plaintiffs' business and competitive industry, the Shao RCA contained various restrictive covenants, including a non-disclosure provision, covering both

1   Plaintiffs Answers and ForeSee, as well as their other affiliates.

2       31.   The Shao RCA non-disclosure provision stated:

3         During your relationship with [Plaintiffs] and at all times thereafter, you
agree that you shall not use, or permit to be used, for any purpose other
4         than the furtherance of the business of [Plaintiffs], or disclose to any
person, any Proprietary Information of the [Plaintiffs]or its affiliates.
5         Upon termination of your relationship with [Plaintiffs], you shall
immediately surrender and turn over to the [Plaintiff] all documents,
6         regarding proprietary information. By your acceptance, you
acknowledge that all such documents and materials are the sole property
7         of [Plaintiffs] and that you shall not make any copies thereof." *See
Exhibit 3, Section 1a.*

8

9       **D.**   **Defendant Amod Setlur**

10       32.   Defendant Setlur was employed by Answers before its acquisition of ForeSee.  As

11   relevant here, on or about May 5, 2015, Defendant Setlur entered into an employment agreement

12   with Answers for the position of "Vice President, Engineering." A true and correct copy

13   (redacted) of Setlur's employment agreement is attached hereto as Exhibit 4.

14       33.   Concurrently with Setlur's employment agreement, he signed a Restrictive

15   Covenants and Invention Rights Agreement (the "Setlur RCA").  *See Exhibit 5.*

16       34.   Due to the nature of Plaintiffs' business and the competitive industry in which it

17   operates, the Setlur RCA contained various restrictive covenants, including a non-disclosure

18   provision, covering both Plaintiffs Answers and ForeSee, as well as their other affiliates.

19       35.   The Setlur RCA non-disclosure provision stated:

20         During your relationship with [Plaintiffs] and at all times thereafter, you
agree that you shall not use, or permit to be used, for any purpose other
21         than the furtherance of the business of [Plaintiffs], or disclose to any
person, any Proprietary Information of the [Plaintiffs] its affiliates. Upon
22         termination of your relationship with [Plaintiffs], you shall immediately
surrender and turn over to the [Plaintiff] all documents, regarding
23         proprietary information. By your acceptance, you acknowledge that all
such documents and materials are the sole property of [Plaintiffs] and that
24         you shall not make any copies thereof." *See Exhibit 5, Section 1a..*

25

26       **E.**   **The Development of "Feedback" Functionality**

27       36.   As part of Answer's initiative to develop the aforementioned "Feedback"

28   functionality, Alexei White worked closely with Wang, Shao and Setlur on Feedback and Session

1   Replay technology development from January 2014 through January 2016.

2       **F.**    **The Departure of the Three Executives**

3       37.    It was in January 2016 when Wang, Setlur, and Shao's employment with Answers

4   ended on mutually-satisfactory terms.

5       38.    When Wang, Setlur, and Shao left their jobs with Plaintiffs, each of them executed

6   a separation agreement. *See Exhibit 6 for the Shao Separation Agreement, Exhibit 7 for the Setlur*

7   *Separation Agreement, and Exhibit 8 for the Wang Separation Agreement.*

8       39.    Among other provisions, and for valuable consideration, each of the separation

9   agreements expressly stated "[a]ll terms and conditions stated in the Employment Agreement

10  that survive the termination of employment, including but not limited to those provisions

11  included in [the respective Defendant's RCA], remain in full force and effect as described

12  therein." *See Paragraph 1 of each individual Defendant's Separation Agreement.*

13      40.    According to Wang's separation agreement, Answers paid Wang a generous

14  amount totaling well into the six-figure range.

15      41.    According to Setlur's separation agreement, Answers paid him a generous amount

16  totaling well into the five-figure range.

17      42.    According to Shao's separation agreement, Answers paid him a generous amount

18  totaling well into the five-figure range.

19      43.    Also according to Wang's separation agreement, Wang was to remain available

20  to the Plaintiffs for up to three months following the separation date for consultation and

21  assistance.

22      44.    Almost immediately after leaving Plaintiffs' employ, and on February 1, 2016,

23  Wang, Shao and Setlur formed AURYC, although its business purpose, field of operation, and

24  technology were not known to Plaintiffs or in any way publicly available for many weeks

25  thereafter.

26      45.    Only recently Plaintiffs learned that AURYC and the defendants are offering for

27  sale software that "unif[ies] Behavior Analytics, Feedback, and Session Replay as one integrated

28

COMPLAINT

1    platform so you can transform your insights into actions," using Plaintiffs' confidential and trade

2    secret information in violation of law and their respective agreements discussed above.

3    **G.    Plaintiffs' Proprietary Software Code**

4    46.    Plaintiffs' software helps its customers understand how their customers are using

5    their websites.  Plaintiffs' software is designed to collect data from a website user via JavaScript

6    code, which is packaged into the website itself.  The user of the computer is typically a customer

7    of the Plaintiffs' customer.  Plaintiffs' software then transmits the data from the user's computer

8    to Plaintiffs' back end server system, and uses back end server-side software to generate valuable

9    metrics and visual tools.

10    **1.    Plaintiff's Software Code Includes the JavaScript Code and the**
      **Server Applications**

11

12    47.    Here is a diagram showing the general arrangement:

13

14    

15

16

17    48.    To collect data from an individual user using a website, a portion of Plaintiffs'

18    software must be in JavaScript format to match the programming language that software

19    programs use when running on a website.  Because this portion is hosted on the subject website,

20    it is publicly viewable.  But while the JavaScript code is viewable, it is also obfuscated and cannot

21    be read or understood readily.

22    49.    The JavaScript code runs on the computer shown above on the left.

23    50.    Also, the server-side portion of Plaintiffs' software, the part that makes the public

24    side function, is entirely inaccessible to public view.  This software is hosted on a number of

25    devices shown above on the right collectively as the Server System, and is referred to as the

26    "Server Applications."

27    **H.    The Foresee Copyrighted Software**

28    51.    ForeSee owns the copyrights and corresponding registrations in the software

8

comprising both the JavaScript code and the Server Applications.

52.     For example, ForeSee owns U.S. Copyright Registration TX 8-437-492 for a published work entitled Record Code. (Exhibit 9)

53.     ForeSee also owns U.S. Copyright Registration TX 8-437-557 for a published work entitled Feedback. (Exhibit 10)

54.     ForeSee also owns U.S. Copyright Registration TX 8-439-433 for a published work entitled Utils Code. (Exhibit 11)

55.     ForeSee also owns U.S. Copyright Registration TX-8-439-430 for a published work entitled Trigger Code. (Exhibit 12)

56.     And ForeSee owns U.S. Copyright Registration TXu 2-056-142 for an unpublished collection of software running mainly on the server side. (Exhibit 13)

57.     The web-hosted software code running on the computer above on the left does not work without a link to the server-side Server Applications running on the Server System above on the right.

58.     ForeSee's browser-based JavaScript code transmits data to the proprietary Server Applications in an undocumented, obfuscated data format that is not publicly described anywhere.

59.     This transmission data describes, in detail, information about how people are using the subject website.

60.     This data is used to analyze the behavior of website visitors and to document what users do on the website, all within the Server Applications.

**I.     AURYC's Use of Plaintiffs' Software Code**

61.     The Defendants were familiar with all of the Plaintiffs' software, and at least defendant Shao had access to it.

62.     It is obvious that Defendants copied the Plaintiffs' JavaScript code because it is visible on their website and their customers' websites.  The copied JavaScript code includes at least Record code, Feedback code, and Utils code.

63.     The Defendants also copied the Plaintiffs' Server Applications.   The Server

Applications taken by Defendants include at least the following programs: the Client Code Template, the non-public Utils Code, the non-public Trigger Code, the non-public Record Code, the non-public Feedback, the Gateway, the Node Recorder, the Session Processor, the PrePlayer, the Node Replay, the Node API and Reply JS.

64.     Like Plaintiffs, AURYC runs its own server applications for analytics on its own servers.  But in violation of applicable law, the software running on AURYC's servers belongs to Plaintiffs.

65.     It is obvious that the defendants took the Server Applications from the Plaintiffs because it is obvious that they are using the same JavaScript software on their customer browsers. It is readily viewable on the internet.

66.     One can also readily see the information passed from their JavaScript software to their server applications, and it is the same or substantially the same as the information in Plaintiffs' system.

67.     One can infer that the defendants' server applications are the same as the Plaintiffs', because the JavaScript software could interface with their server applications only if their server applications were the same as the Plaintiffs' Server Applications.  The Plaintiffs' web-side JavaScript code is designed to work only with its Server Applications.

68.     AURYC's publicly-available JavaScript implies server applications with precisely the same interface that Plaintiffs' Server Application uses.

69.     AURYC's server-side software is not off-the-shelf or self-developed, but a proprietary collection of Server Applications developed by Plaintiffs, used in tandem with the browser-based JavaScript module.

**J.       Detailed Showing How AURYC Uses Plaintiffs' Server Application Software**

70.     Upon examination of the traffic emitted from AURYC's JavaScript product to their server applications, one can see that they provide the same interface as Plaintiffs' proprietary Server Applications, which in short, shows AURYC uses Plaintiffs' same applications running in AURYC's own server environment.

1          **1.      Both Accept the Same Parameters and the Same Sequence**

2          71.    First, both sets of Server Applications accept the same parameters in the same

3    sequence.

4          72.    For example, here is a sample data transmission to ForeSee's server:

5                 https://rec.replay.answerscloud.com/rec/corsservice?action=data&metada
                  ta=datalen%3A426%2Ctime%3A1510181134088&encoding=windows-
6                 1252&session_id=4377f6f4b4f7d96e3a2fe62c93f2ff51&global_session_i
                  d=0f
7                 b882d70b9de3a9cfc1ffb1cfe67e2d&domain=localhost&site_id=somesite
8                 &version=5.0&cachebust=0.7191805418400736

9          73.    Each of the parameters (everything after the first question mark in the web

10   address) is a proprietary parameter with specific meaning to Plaintiffs and is interpreted by the

11   Server Applications. Here are the parameters sent by Plaintiffs' product to the server compared

12   with those of Auryc:

| ForeSee's Server Parameters | Auryc's Server Parameters |
| --- | --- |
| action | action |
| metadata | metadata |
| encoding | encoding |
| session_id | session_id |
| global_session_id | global_session_id |
| domain | domain |
| site_id | site_id |
| version | version |
| cachebust | cachebust |

21         74.    Here is an example of a typical request by AURYC's product to their server:

22                https://ubatracking.auryc.com/rec/record?action=data&metadata=datalen
                  %3A655%2Ctime%3A1510180822595%2Ccb%3A0&encoding=UTF-
23                8&session_id=defc8f1-10811747-720e-ee15-
                  0bb80&global_session_id=6b8becd3f8cde52902a2d006cbbee86e&domai
24                n=www.auryc.com&cb=0&site_id=121-
                  landingPagecom&version=0.1&cachebust=0.6301772388857199
25

26         75.    Not only do the parameters match 1:1, but there are no additional or missing

27   parameters in AURYC's requests and they are in the same sequence.

28

76.    Also, each parameter is a key/value pair and provides basically the same information to the Server Applications.

### 2.    Both Accept the Same Data Format in the Same Variations

77.    Second, both sets of Server Applications accept the same data format in the same variations.

78.    The data format sent to the Server Applications is obscure, undocumented, and has two variations: compressed and uncompressed. Here are short examples of the uncompressed data format generated by Plaintiffs' real product, as sent to Plaintiffs' proprietary Server Applications:

A compressed example:

_CMP_lVPbbtswDP0Vg4+Bh4q62JJR5Ee6Pkii3Bj14iB2u3ZF/r2U4yxJ
N2SYkZjW4TniRdQHkJ88NA8fME5+P0GDBgVaRKWx0iX0w9PsfY
MGBJSQmIElEDRHzDK2yYuXjjEIUgoTKFRBi+CsMpowaGvqlGpKR
Mx+7pm3mX70ZRjonQHq2va8g4kiSa2jllKpytsYW5LGVsEoSZ5iFmT
2wIkoJ10JERpRwp61485v10VR3N9R97qGAz8lcE3iUF5VUC17sAum9
DYxmr2O7StbOKqkszd0Y+pTPCmR7fgru37m/pi5J8jynCZ3L+86bbpx2
GXFHJZXBf/8tmCwG7Yc9Mjz22HapP2ZugBfeSEs/tD7+MwbURH6lw
SHR86lm4v+zyrkZRVay79VsVotUVf5KeY3m98fpzf/F3OJLvb6c1n9O/
GrwauuB89iECJF5WqstaopypiQorFEqfU+l3YevE3y9ICPf86eT0ZpL+q
QjI9aaRmwtRpbLTHyx9Xs1Tx059H7Duv7uzHuu910Y/B4MOYNxnzR
jhS0Qn5h8bWbWbtxKdZWXPl7boBiEQPfzmJGbou15qgsVpLjXIqlQH
cjv9MxCOPyyTwdW5SCouCcqlpXK9dGU/Ed9EiYyCVVez7Fwyc=

An uncompressed example:



79.    It is important to note the obscure "_CMP_" symbol near the beginning of the compressed example. This is a proprietary marker that asks the receiving server to parse and uncompress the data in a particular way.

80.    This technique is not documented anywhere or in any public disclosures.

81.    Looking at the data accepted by AURYC's server, and over a single page load, one can see that both formats are transmitted and successfully received by AURYC's server.

Here are some examples:

A compressed example received by AURYC's server:

▼ **Request Payload**    view parsed

{"cp":"_CMP_7X33luJIs+er6GPO/WZmCyPhTHVP30tRUEU5A5TtnlNHSAIEMpQMpnr7nH2NfYR9hv3vPso+yf1lpiQkEBRlur+eu4MzaSMjIzMiIyMjvy JmxHtJzErlAQeKHM14WskC0kE5rZp7GzxG5KSCYUJCglE+PELp9MyIld5Hf0UCahlK8kE2bPTuzmy0gySewmagPL1JUE0uNfMZ9M2CpyJ1BBShMNWTX6F2 30Rq+KWRnPWzTr3VaN7W9xGCenqiZivJBABO7Cv2yOHHCO/hH77sJwLOFMBUsqh5g898mf/2LZkgrfqWpG1ABGlCpAWqjIgEjyJmCE0kWI58JEc22mgCwE 5pfE7peErP5kck9IoV6CiFKq10WVlKIIhRTf7Zb5L4nkl4RBk3aVvmq0FdtWTQQg2LU0GjFwnPFuJjOdTt0ia82lNPCSoSkc1dEUmqZKIrj/ydVc2wFmLa 7kITnZ5p6V88S37yGpHLZYqQt+Az3H/C0L5f2SbgFWSGfQ96ykury+NUTK8UCWjwiHUPQ7ZC++viP/fNa5+6izh12Tk8+fRw4usZJmmjbf3xJDG30MFM905 E02BNBCNvsKJrqya3ESVFZOTbLtvibKKFticORYl1ZlzVr8rcrY7HpsWQlFSXzEUS30UWTINhzQW2URD1UUHWLS5riiN+pbpGrKtPilcT1NmXXPmf2tKX5

An uncompressed example received by AURYC's server:

▼ **Request Payload**    view source

  ▼ {,…}
    cp: "{"data":[{"start":1510180820814,"log":[{"x":0,"e":12,"p":0,"d":{"a":"class","v":"wpb_column col-md-6 col-lg-6

82.    The AURYC data format shows that AURYC is supporting both formats, but wrapping them in a simple JSON object.

83.    More importantly, and within this object, one can see the substance of the data adheres to the same rules as Plaintiffs' code.

### 3.    <u>Both Reply With the Same Response in the Same Format</u>

84.    Third, both Server Applications reply with the same response, formatted in exactly the same way.

85.    When data is posted to either Plaintiffs' Server Applications or the AURYC server applications, both systems reply with the same obscure "success" code.

86.    This code is by no means an industry standard response and does not simply mirror what other systems do naturally.

87.    Specifically, the server replies with an HTTP code of 200 and a JSON object (which is a transport format) with a single attribute "status." The value of this attribute is a string (text) and normally contains the text "1".

Here is the response from ForeSee's application server:



13

Here is the response from AURYC's application server:

×    Headers    Preview    **Response**

```
1   {"status":"1"}
```

88. This "response" shows the back-end server applications are copies of the closed-source, proprietary Server Applications developed by Plaintiffs.

### 4.    <u>Both Have the Same Behaviors and Features</u>

89. Fourth, both sets of Server Applications provide the same behaviors and features.

90. Plaintiffs' Server Applications provide two basic functions to the JavaScript modules – (1) save uncompressed data and saving compressed data; and (2) ping, which keeps the "session" alive for movie making purposes.

91. The AURYC Server Applications provide, at a minimum, all of these features, which confirms the server itself uses the same applications and therefore utilizes the Plaintiffs' software.

92. The knowledge for what each function does and how it does it is proprietary to Plaintiffs and constitutes a trade secret, and this knowledge is not documented anywhere in any public disclosures or documentation.

93. The following are examples of the same behaviors and features:

### 5.    <u>Save uncompressed data and saving compressed data</u>

94. This was elaborated above, but the URL patterns for this are the same for both Plaintiffs' server and AURYC's server:

Plaintiffs' example:

Note: "action=data":
https://rec.replay.answerscloud.com/rec/corsservice?action=data&metadata=datalen%3A426%2Ctime%3A1510181134088&encoding=windows-1252&session_id=4377f6f4b4f7d96e3a2fe62c93f2ff51&global_session_id=0fb882d70b9de3a9cfc1ffb1cfe67e2d&domain=localhost&site_id=somesite&version=5.0&cachebust=0.7191805418400736

Reply: {"status":"1"}

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AURYC example:

Note: "action=data"
https://uba-
tracking.auryc.com/rec/record?action=data&metadata=datalen%3A655%
2Ctime%3A1510180822595%2Ccb%3A0&encoding=UTF-
8&session_id=defc8f1-10811747-720e-ee15-
0bb80&global_session_id=6b8becd3f8cde52902a2d006cbbee86e&domai
n=www.auryc.com&cb=0&site_id=121-
landingPagecom&version=0.1&cachebust=0.6301772388857199

Reply: {"status":"1"}

**Ping**

95.     Ping is another request type that has the effect of telling the Server Applications that the request is "still alive."

96.     This is achieved by issuing an HTTP request with "action=ping" in the parameters.

97.     For AURYC's software to have this effect, AURYC would need to have Plaintiffs' proprietary knowledge of the action and how to handle it.

98.     AURYC's product issues this command to its own server on a regular basis (as does Plaintiffs'), shown as follows:

Plaintiffs

https://rec.replay.answerscloud.com/rec/corsservice?action=ping&global_ses
sion_id=0fb882d70b9de3a9cfc1ffb1cfe67e2d&session_id=4377f6f4b4f7d96
e3a2fe62c93f2ff51&site_id=somesite&cachebust=0.9779063984662213

AURYC

https://uba-
tracking.auryc.com/rec/record?action=ping&global_session_id=6b8becd3f8c
de52902a2d006cbbee86e&session_id=defc8f1-10811747-720e-ee15-
0bb80&site_id=121-
landingPagecom&cb=0&cachebust=0.9103478865386474

6.     **It Is Not Possible to Reverse-Engineer Plaintiffs' Server Applications**

99.     Wang, Setlur and Shao left Plaintiffs in January of 2016, and started the AURYC business the next month.

100.    Wang, Setlur and Shao were intimately involved in the Replay product development for two years prior to leaving, and all three assigned their rights to inventions to Plaintiffs.

101.    Wang, Setlur and Shao were intimately familiar with the JavaScript Tracking Code and the Server Applications.

102.    If Wang, Setlur and Shao had decided to accomplish the Server Application functionality in a different way, they could not have used Plaintiffs' JavaScript modules (the publicly available information) in combination with their own invention.

103.    For example, Plaintiffs' Session Replay JavaScript module transmits this information to the Server Application:

▼ Request Payload    view source
  ▼ {data: [{start: 1510185251136,…}]}
    ▼ data: [{start: 1510185251136,…}]
      ▼ 0: {start: 1510185251136,…}
          guid: "fcc45a7f80951a04aa4a6896936bd2cd"
        ▼ log: [{x: "0", e: 2, d: {sz: {w: 1084, h: 358}, avs: {w: 1084, h: 2511}, st: 0, m: false}, t: 9989},…]
          ▶ 0: {x: "0", e: 2, d: {sz: {w: 1084, h: 358}, avs: {w: 1084, h: 2511}, st: 0, m: false}, t: 9989}
          ▶ 1: {x: "0", e: 18, d: {sz: {w: 1084, h: 2511}}, t: 9979}
          ▶ 2: {x: "0", e: 5, d: {st: 1}, t: 9862}
          ▶ 3: {x: "0", e: 4, d: {ps: {x: 348, y: 89}, x: -1}, t: 9862}
          ▶ 4: {x: "0", e: 5, d: {st: 0}, t: 10017}
          start: 1510185251136

104.    It is impossible to know from the JavaScript Tracking Code what the Server Applications do with that information.  In order to produce a Session Replay "movie" from this raw data, the Server Applications must both know (a) what each attribute in the event payload signifies, and (b) how to use the information contained in the payload to correctly compile a Session Replay "movie."

105.    The meaning of these meta-data fields is not documented anywhere publicly, and the technology to translate these events into a script to produce a movie is restricted to non-public technology developed by Plaintiffs.

106.    Wang, Setlur and Shao only had access to this technology by virtue of their employment with Plaintiffs and their work on the Replay software, which includes the Tracking Code and the Server Applications.

107.   The numerical value of the x's, e's, d's, and t's transmitted by the JavaScript module communicate how a website user interacted with aspects of the website.  But the event codes themselves are not explained or documented anywhere in the code.

108.   Even if one could reverse-engineer the original source to determine an approximate meaning of each code (in the short time after leaving Plaintiffs' employment), how the event is used in the Session Replay reproduction is not known and cannot be logically deduced.

109.   For example, e:2 refers to what part of the webpage the user was viewing and e:4 means the user moved his mouse.  Each such permutation is part of Plaintiffs' proprietary and confidential Server Application code.

110.   AURYC's JavaScript module transmits this data to AURYC's Server Applications:

```
▼ {data: Array(1)} ℹ
  ▼ data: Array(1)
    ▼ 0:
        guid: "defc8f1-10059459-530c-2f7b-2bf78"
      ▼ log: Array(4)
        ▶ 0: {x: 0, e: 5, p: 0, d: {…}, t: 80489}
        ▶ 1: {x: 39, e: 1, p: 0, d: {…}, t: 80492}
        ▶ 2: {x: 0, e: 4, p: 0, d: {…}, t: 80492}
        ▶ 3: {x: 0, e: 5, p: 0, d: {…}, t: 80493}
```

111.   This data only builds a Session Replay "movie" on Plaintiffs' proprietary Server Applications.

112.   Even with years of development, Wang, Setlur and Shao could not have invented their own version of the software code to support the Plaintiffs-designed JavaScript module used on their (and Plaintiffs') website.

113.   Instead, they started doing business with Plaintiffs' proprietary code after leaving their employ.

114.   Defendants offer for sale their software on the Internet from their website www.auryc.com.

115.    The Defendants took copies of Plaintiffs' software when they left the employment with Plaintiffs.

116.    Defendants continue to make, copy, sell, and distribute the AURYC software without permission from Plaintiffs and in violation of their rights.

**COUNT I**
**COPYRIGHT INFRINGEMENT**
**17 U.S.C. §§101, et. seq.**
(Against all Defendants)

117.    Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, paragraphs 1 through 116 of this complaint.

118.    The actions of Defendants described above, and specifically their use, marketing and sale of the Replay technology, constitutes copyright infringement as defined by Title 17 of the United States Code.

119.    Plaintiffs are the owners of all right, title, and interest in the copyrighted software discussed above, together with the copyright registrations listed above, which is designed to collect data from a user's computer running a JavaScript-based website, transmit the data to Plaintiffs' back end Server Applications, and use the Server Applications to generate valuable metrics and visual tools.

120.    Plaintiffs have complied in all respects with 17 U.S.C. § 102 et. seq., the statutory deposit and registration requirements thereof, and all of the laws governing federal copyrights to secure the exclusive rights and privileges in and to the copyrights in the software discussed above.

121.    Defendants have infringed Plaintiffs' exclusive rights in the software pursuant to Section 106 of the Copyright Act by reproducing it, distributing it, publicly displaying it and utilizing it in on their website; and upon information and belief, in the advertising for their competing products and services, without authorization for their own financial and competitive advantage, in violation of 17 U.S.C. § 501.

122.    Upon information and belief, Defendants have willfully infringed Plaintiffs' copyrights in the software discussed above.

123.    Plaintiffs are entitled to a preliminary and permanent injunction restraining Defendants from engaging in any acts in violation of the United States copyright laws.

124.    Plaintiffs are entitled to recover from Defendants the damages they have and will sustain as a result of Defendants' wrongful acts, as described above, in an amount to be determined at trial, including, but not limited to, Defendants' gains, profits and advantages obtained as a result of their wrongful acts.

**COUNT II**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**18 U.S.C. §1836**
(Against all Defendants)

125.    Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, paragraphs 1 through 124 of this complaint.

126.    The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the United States Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1) (as amended).

127.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (as amended).

128.    Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by

19

1    improper means; or (B) disclosure or use of a trade secret of another without express or implied

2    consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or

3    (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade

4    secret was: (I) derived from or through a person who had used improper means to acquire the

5    trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the

6    trade secret or limit the use of the trade secret; or (III) derived from or through a person who

7    owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the

8    use of the trade secret; or (iii) before a material change of the position of the person, knew or had

9    reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret

10    had been acquired by accident or mistake." 18 U.S.C. § 1839(5) (as amended).

11        129.    Under the DTSA, "improper means" "(A) includes theft, bribery,

12    misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage

13    through electronic or other means; and (B) does not include reverse engineering, independent

14    derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6) (as amended).

15        130.    Certain confidential and proprietary information of Plaintiffs constitutes trade

16    secrets related to a product or service used in, or intended for use in, interstate commerce,

17    including, but not limited to, portions of the software discussed above.   This includes the

18    obscured software running on an individual's browser and the software in the Server

19    Applications.   It also includes data and data structures used by the software.

20        131.    Plaintiffs derive economic value from the fact that their trade secrets are not

21    generally known to individuals or entities outside of ForeSee and Answers.

22        132.    Plaintiffs take reasonable measures to protect the secrecy of such trade secrets.

23    These measures include maintaining a computer system that constantly works on protecting this

24    information from being accessed by unauthorized users, both inside and outside Answers and

25    ForeSee, restricting access to a limited number of employees at Answers and ForeSee who need

26    access to such information in order to perform their assigned tasks and requiring all of its

27    employees to sign confidentiality provisions and restrictive covenants.

28

133.    Wang, Shau and Setlur knew they had a duty to maintain the secrecy of Plaintiffs' trade secrets due, in part, to their fiduciary duties and duties of loyalty to Plaintiffs and each of their acknowledgement of such duties under their respective employment and restrictive covenant agreement.

134.    AURYC is under a duty to not accept any misappropriated trade secrets, including Plaintiffs' trade secrets, and AURYC is also under a duty not to disclose or use misappropriated trade secrets for the purpose of gaining a competitive advantage in the marketplace.

135.    Upon information and belief, AURYC, Wang, Shao and Setlur have already and/or will improperly acquire, disclose, and use Plaintiffs' trade secrets without consent of any kind for their own financial gain.

136.    Wang, Shao and Setlur will continue to disclose and utilize Plaintiffs' trade secrets in the course of their employment with AURYC by using this information to unfairly compete with Plaintiffs by developing, among other things, Plaintiffs' Session Replay technology.

137.    AURYC, Wang, Shao and Setlur's actions constitute actual and/or threatened misappropriation in violation of the DTSA.

138.    Plaintiffs have suffered irreparable damages as a result of AURYC, Wang, Shao and Setlur's actual and/or threatened breach of the DTSA, including loss of customers and employees, harm to its goodwill and reputation, and an unfair reduction in its competitive advantage.

139.    Plaintiffs are entitled to actual damages from AURYC, Wang, Shao and Setlur, jointly and severally, and for attorneys' fees.

140.    Plaintiffs' damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

141.    AURYC, Wang, Shao and Setlur's actions will continue to cause irreparable harm and damages to Plaintiffs and their trade secrets.

**COUNT III**
**BREACH OF CONTRACT**
(Against Wang, Shao and Setlur)

142.    Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, paragraphs 1 through 141 of this complaint.

143.    Wang, Shao and Setlur each entered into the Restrictive Covenant Agreements and Employee Agreements with Answers.  Upon the conclusion of their employment relationship with Answers, each Defendant entered into a Separation Agreement, which among other things, made clear that "[a]ll terms and conditions stated in the Employment Agreement that survive the termination of employment, including but not limited to those provisions included in [the respective Defendant's RCA], remain in full force and effect as described therein."

144.    These Agreements were part of the consideration for the continued employment with and compensation from Answers.

145.    The Agreements were accepted by and agreed to by Defendants Wang, Shao and Setlur and forms a part of their employment with Answers.

146.    Answers has performed all conditions, covenants and promises required of them under the terms and conditions of the Agreements, except for those promises, conditions and covenants excused by the acts and omissions of Defendants as herein described.

147.    In fact, Answers paid several hundred thousand dollars to Wang, Shao and Setlur.

148.    Wang's Restrictive Covenant Agreement defines proprietary information belonging to Plaintiffs as including:

> "...trade secrets, inventions, ideas, formulas, processes, prototypes, models, source and object codes, data, know-how, improvements, discoveries, designs, and techniques developed, created, conceived of, or reduced to practice.), product information, financial information, client lists, candidate lists, and overall strategies." *See Exhibit 1A, Section 1.*

149.    Shao and Setlur's Restrictive Covenant Agreement defines proprietary information belonging to Plaintiffs as including:

> "…all information, data, and materials relating to the business of [Plaintiffs], including without limitation: (i) trade secrets, inventions, ideas, formulas, processes, prototypes, models, source and object codes, data, know-how, improvements, discoveries, designs, and techniques developed, created, conceived of, or reduced to practice by any employee

22

or contractor of [Plaintiffs]or its affiliates; (ii) the nature and description of development and business plans for [Plaintiffs]or its affiliates, including plans for research and future projects, budgeting, marketing, customer data, and information relating to relationships between [Plaintiffs] and other entities, including licenses and other contracts; (ii) reports and data developed or acquired by [Plaintiffs] or its affiliates; and (iv) forms, policies, and other forms of written and non-written (including intangible) data, experience, and information, whether of a technical, operational, economic nature relating to the business, services and employees of [Plaintiffs] or its affiliates. "Proprietary Information" includes the Proprietary Information of third parties that [Plaintiffs are] required to keep confidential." *See Exhibit 3, ¶1(b), See Exhibit 5, ¶1(b).*

150.    Defendants breached their respective Restrictive Covenant Agreements and the related implied covenant of good faith and fair dealing by at least misappropriating, converting, using and/or disclosing Plaintiffs' confidential information, failing to apprise Plaintiffs of the unauthorized use and disclosure of their confidential information, and by making false statements and/or concealing facts to prevent Plaintiffs from learning of the Defendants' activities.

151.    As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered injury and harm, and Defendants, including AURYC, have been unjustly enriched, in amounts according to proof but in excess of the minimum jurisdiction of this Court.

152.    By entering into the respective employment and restrictive covenant agreements, Defendants acknowledged that any breach of those agreements may be harmful or prejudicial to Plaintiffs and these breaches have, in fact, caused and continue to cause Plaintiffs irreparable injury and cannot be fully redressed through damages alone. An injunction is necessary to provide Plaintiffs with at least some measure of relief.

**COUNT IV**
**BREACH OF THE DUTY OF LOYALTY**
(Against Wang, Shao and Setlur)

153.    Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, paragraphs 1 through 152 of this complaint.

154.    As employees of Plaintiffs, Wang, Shao and Setlur owed obligations and duties to Plaintiffs, including obligations not to use or disclose, without Answers and ForeSee's authorization, their confidential and proprietary information, including their source code, object code, and other Confidential Information, or information derived therefrom, and to return all of

23

Plaintiffs' property upon termination of their employment, and not to use Plaintiffs' proprietary information, to enrich themselves at Plaintiffs' expense.

155.   As employees of Plaintiffs, Wang, Shao and Setlur each owed undivided loyalty to both Answers and ForeSee.

156.   While employed by Plaintiffs, Wang, Shao and Setlur took action that was inimical to the best interests of the employers, including but not limited to competing with Plaintiffs, utilizing Plaintiffs' confidential and proprietary information, assisting Plaintiffs' competition (including but not limited to Wang, Shao and Setlur's business, AURYC), and Wang, Shao and Setlur all acquired a material benefit from Plaintiffs' Confidential Information.

157.   While Wang, Shao and Setlur were employed by Plaintiffs, they wrongfully used and pilfered Plaintiffs' confidential and proprietary information, including their source code, object code, data, and other Confidential Information, or information derived therefrom, without Plaintiffs' authorization.

158.   Moreover, Wang, Shao and Setlur were all placed in a position of trust by Answers and ForeSee with respect confidential and proprietary information, including their source code, object code, and other Confidential Information, and as such, owed an obligation to Plaintiffs not to disclose any of the aforementioned information to any third party (or parties), or to use it for the benefit of themselves or any third party, whether before or after their departure.

159.   Defendants Wang, Shao and Setlur breached their obligations and duty of loyalty to Plaintiffs by wrongfully obtaining, accessing, utilizing and purloining their confidential and proprietary information, including but not limited to their source code, object code and other proprietary information, and by disclosing such information and the fruits of their misappropriation to, and using such information for the benefit of themselves, without Plaintiffs' authorization, to the detriment of both Answers and ForeSee.

160.   As a direct and proximate result of Wang, Shao and Setlur's conduct, Plaintiffs have suffered injury and loss and are entitled to damages in an amount to be proven at trial.

161.   As a result of Defendant Wang, Shao and Setlur's improper conduct, Plaintiffs are entitled to restitution and disgorgement of any costs, profits, and any other benefits whatsoever resulting from their breaches of their duties of loyalty.

162.   Defendant Wang, Shao and Setlur's misconduct was fraudulent, malicious, oppressive, and in willful disregard of the rights of Plaintiffs. Plaintiffs are therefore entitled to exemplary or punitive damages against Wang, Shao and Setlur.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
(Against Wang, Shao and Setlur)

163.   Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, paragraphs 1 through 162 of this complaint.

164.   As employees in an executive capacity, Wang, Shao and Setlur owed Plaintiffs a fiduciary duty not to disclose confidential information, as well as not to utilize Plaintiffs' own Confidential Information against them and in direct competition with them.

165.   Defendants Wang, Shao and Setlur breached their fiduciary duties to Plaintiffs by wrongfully obtaining, accessing, utilizing and purloining their confidential and proprietary information, including but not limited to their source code, object code and other Confidential Information, and by disclosing such information and the fruits of their misappropriation to, and using such information for the benefit of themselves, without Plaintiffs' authorization, to the detriment of both Answers and ForeSee.

166.   As a direct and proximate result of Wang, Shao and Setlur's conduct, Plaintiffs have suffered injury and loss and are entitled to damages in an amount to be proven at trial.

167.   As a result of Defendant Wang, Shao and Setlur's improper conduct, Plaintiffs are entitled to restitution and disgorgement of any costs, profits, and any other benefits whatsoever resulting from their breaches of their duties of loyalty.

168.   Defendant Wang, Shao and Setlur's misconduct was fraudulent, malicious, oppressive, and in willful disregard of the rights of Plaintiffs. Plaintiffs are therefore entitled to exemplary or punitive damages against Wang, Shao and Setlur.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs ForeSee Results, Inc. and Answers Corporation pray for judgment in their favor and against Defendants as follows:

1.      For preliminary and permanent injunctive relief as set forth herein;

2.      For damages according to proof;

3.      For disgorgement of unjust enrichment according to proof;

4.      For punitive damages as may be provided by law;

5.      For Plaintiffs' attorneys' fees and costs as may be provided by law;

6.      For pre-judgment and post-judgment interest as may be provided by law; and

7.      For any and all such further relief as the Court may deem just and proper.

Dated:  December 6, 2017                    **HOWARD & HOWARD ATTORNEYS PLLC**

By: */s/ Ryan A. Ellis*
    Ryan A. Ellis, Esq.
    *Attorneys for Plaintiffs ForeSee Results, Inc.*
    *and Answers Corporation*

1

## DEMAND FOR A JURY TRIAL

2

Plaintiffs ForeSee Results, Inc. and Answers Corporation request a trial by jury on all

3

issues for which they are entitled to a jury.

4

5

Dated:  December 6, 2017                    **HOWARD & HOWARD ATTORNEYS PLLC**

6

7

By: */s/ Ryan A. Ellis*

Ryan A. Ellis, Esq.
*Attorneys for Plaintiffs ForeSee Results, Inc.*
*and Answers Corporation*

8

9

10

11

12    4829-0398-7029, v. 4

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEMAND FOR JURY TRIAL